# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **AUSTIN BEACH CLUB, LLC,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **No. 1:23-CV-00603-RP** |
| | § | |
| **ETHEREAL, LLC, STEPHEN** | § | |
| **SABO,** | § | |
| *Defendants* | | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE ROBERT PITMAN
       UNITED STATES DISTRICT JUDGE

Before the Court is Plaintiff Austin Beach Club, LLC's ("ABC") Motion to Dismiss Defendant Ethereal, LLC and Stephen Sabo's (collectively, "Ethereal") Amended Counterclaims, Dkt. 23. After reviewing these filings and the relevant caselaw, the undersigned recommends that ABC's Motion be denied.

## I.       BACKGROUND

Proverbially, golf is a good walk spoiled. ABC set out to change that stodgy reputation with a bold new business venture—building a par-three golf course in the heart of Austin ("the Golf Course"). The Golf Course wouldn't be limited to only golf, but would include two music venues, a social club, a boathouse/dock style bar, stand-up paddleboarding, pickle ball, a pool, a sauna, a cold plunge, a practice facility, and more. Dkt. 16, at 13-14.

As a part of this innovative scheme to bring golf into the 21st century, ABC also had a new and exciting plan for administering golf memberships. Rather than a traditional membership structure, ABC would pair with a company named Ethereal to provide memberships through non-fungible tokens, or NFTs. *Id.* at 15. But as construction on the Golf Course stalled, the relationship between ABC and Ethereal spoiled. This case revolves around the fallout of that commercial relationship.

### A.    The Parties

Ethereal is a company providing "Web3, Blockchain, & NFT Consulting" services. Dkt. 16, at 12.[1] In early 2022, representatives of Ethereal met with Lauren Carson, the founder of ABC. *Id.* at 13. Carson had a bold business strategy—to build a par-three golf course in the heart of Austin. The plan was for the Golf Course to be built on land owned by Carson through her entity Old Man City, LLC ("OMC"). *Id.* Carson pitched the following timeline to Ethereal: the holes and clearing fairways would begin in May 2022, permits would be granted by May 2023, and the grand opening would occur in September 2023. *Id.* at 13.

Ethereal would provide a unique service rarely used at golf courses—nonfungible tokens, or NFTs. *Id.* at 15. Essentially, Ethereal would provide a unique digital token that would serve as memberships to golf courses around the country. *Id.* at 12. Ethereal pitched two types of memberships to ABC. The first, the Local Membership, would cost $9,500 and provide an unlimited one-year membership to

---

[1] Given the procedural posture of this dispute, the undersigned accepts all of Ethereal's well-pleaded facts as true. *See Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 217 (5th Cir. 2009) ("In ruling on a motion to dismiss, a court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.") (internal quotation marks omitted).

the Golf Course. *Id.* at 14. The second, Global Membership, would cost $2,500 and provide eight days of access per year to the Golf Course. *Id.* One of the unique benefits of offering membership through NFTs is that members could sell or lease their memberships to non-members. *Id.*

## B.  The Agreements

Around July or August 2022, Carson and Ethereal negotiated a master service agreement ("MSA"), under which Ethereal would provide services to Carson and her then-existing entities, pursuant to the written Statement(s) of Work ("SOW"), which became part of and subject to the MSA. *Id.* at 14-15. Under the then-applicable SOW, Ethereal was required to perform the following services:

> Develop the marketplaces to specs; Set up your Discord community (separate monthly charge for running it); Design, Develop, and Mint your NFTs; A successful roll-out of the NFT drop, whitelisting, and subsequent drops to minimize friction and maximize the upside for both the community and ABC owners; Develop and coordinate design of digital items (separate charge for designer); Potential Connections for the food and beverage affiliates; and Marketing strategy for launch of venue and NFT drop.

*Id.* at 15.

The then-applicable SOW also provided that Carson and OMC would pay consulting fees to Ethereal. Specifically, Carson and OMC would pay a $25,000 consulting fee due on the SOW effective date and a $50,000 deferred consulting fee from the first NFT mint. The SOW also provided that Ethereal would be paid:

> For the initial four (4) years following the SOW Effective Date, fifteen percent (15%) of Net Revenue. From the fourth anniversary of the SOW Effective Date through the tenth anniversary of the SOW Effective Date, ten percent (10%) of Net Revenue. Thereafter, in perpetuity, five percent (5%) of Net Revenue.

*Id.* In addition, Carson and OMC were required to reimburse expenses incurred by Ethereal that were either expressly identified or approved in advance. *Id.* at 16. The last version of the MSA was sent to Carson and OMC on or about August 1, 2022. *Id.* Shortly thereafter, Carson and OMC requested that Ethereal begin performing pursuant to the MSA. *Id.* About two weeks later, Ethereal sent an invoice to Carson for $25,000 under the MSA. *Id.*

In addition to the MSA, the parties also entered into a second agreement (the "Proposed Second Agreement") which dictated that Ethereal, Carson, OMC, and an entity called Project GG, LLC ("GG"), would co-own the Golf Course and the entity that would own it, ABC. *Id.* at 17. Under that agreement, Carson, OMC, and GG would form ABC which would own the Golf Course, and Ethereal would co-own ABC and the Golf Course. *Id.* Specifically, Ethereal would get fifteen percent of ABC and the Golf Course and would receive an additional ten percent upon the total of $500,000 in memberships sold. *Id.*

### C.    The Breakdown

Problems arose starting in November 2022. Ethereal alleges that during that period Carson tried to blame low sales on Ethereal, even though construction on the Golf Course had stalled. *Id.* at 19. In December 2022, Ethereal also grew concerned over OMC changing its leasing price for ABC. *Id.*

The relationship broke down completely in February 2023. During a scheduled call with Ethereal, Carson said that she was terminating the relationship with Ethereal and all plans to sell ABC memberships via NFTs. *Id.* at 20. Carson further

indicated that she was transitioning toward traditional memberships for ABC. *Id.* at 28. That concerned Ethereal since it had already sold NFT memberships for the Golf Course, raising the possibility of customers demanding refunds. *Id.* Indeed, at least one NFT Membership purchaser has initiated a chargeback, requesting a refund of the membership purchase. *Id.*

ABC sued Ethereal, alleging breach of contract, conversion, claims under the Texas Theft Liability Act, and money had and received. Dkt. 1-1, at 8-12. Ethereal alleged seven counterclaims: (1) breach of contract; (2) promissory estoppel; (3) quantum meruit; (4) unjust enrichment; (5) money had and received; (6) fraud/fraudulent inducement; and (7) declaratory judgment. Dkt. 16, at 22-30. ABC then moved to dismiss those amended counterclaims, Dkt. 23, under Federal Rule of Civil Procedure 12(b)(6). That Motion is before the undersigned for consideration.

## II.      LEGAL STANDARD

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when

assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

## III.    DISCUSSION

Ethereal alleges seven counterclaims: (1) breach of contract; (2) promissory estoppel; (3) quantum meruit; (4) unjust enrichment; (5) money had and received; (6) fraud/fraudulent inducement; and (7) declaratory judgment. Dkt. 16, at 22-30. Ethereal has filed a motion to dismiss all those amended counterclaims. Dkt. 23. The undersigned will go through each in turn.

### A.    Breach of Contract

Ethereal's first amended counterclaim alleges that Carson, OMC, and ABC breached the MSA ("Count I"). Dkt. 16, at 37-38. Specifically, Ethereal alleges that "[a]lthough the MSA was never executed, it was accepted by performance." *Id.* at 37. Ethereal further claims that in February 2023, Carson and OMC terminated the MSA, breaching their obligations through repudiation. *Id.* Ethereal says that "OMC's breach of the MSA caused Ethereal to sustain damages because (i) Ethereal is still owed the Deferred Consulting Fee and a percentage of Net Revenue; and (ii) they failed and refused to reimburse Ethereal expenses incurred that are due and owing under the MSA." *Id.* at 38.

ABC argues that Ethereal fails to state a claim for breach of contract for two reasons. Dkt. 23, at 2. First, ABC argues that Ethereal's claim for breach of contract arising from the unaccepted MSA fails to satisfy the statute of frauds and should therefore be dismissed. *Id.* at 3. Second, ABC argues that Ethereal's claim should also be dismissed because Ethereal failed to adequately allege a meeting of the minds as to the unaccepted MSA. *Id.* at 4.

1. **The statute of frauds does not warrant dismissal.**

Texas law governs this dispute.[2] Under Texas law, "an agreement which is not to be performed within one year from the date of making the agreement" "is not enforceable unless" it is "(1) in writing; and (2) signed by the person to be charged with the promise or agreement." Tex. Bus. & Com. Code § 26.01(a), (b)(6).

ABC argues that the statute of frauds prevents Ethereal's breach of contract claim because the agreement in dispute "was an ongoing, multi-year contract," but was not signed. Dkt. 23, at 3. For instance, the MSA obligates ABC to make certain payments to Ethereal on the "fourth anniversary of the SOW Effective Date through the tenth anniversary of the SOW Effective Date," Dkt. 16, at 16, as well as "five percent (5%) of Net Revenue" to be paid "in perpetuity," *id.* Accordingly, ABC argues, the contract could not be completed in a year and therefore needed to be in writing and signed by ABC.

Ethereal disagrees. It says that the MSA was terminable upon 30 days' prior written notice by either party and therefore could be completed within one year. Dkt. 26, at 2. But Texas caselaw holds that a termination provision has no effect on the application of the statute of frauds where the entire agreement is not capable of being fully performed within one year. *See Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 547

---

[2] Neither side disputes that Texas law applies. *See* Dkt. 23, at 3 (ABC citing Texas law); Dkt. 26, at 2 (Ethereal citing Texas and New York law). "Texas courts presume that other states' laws are the same as its own; thus, the party advocating the use of a different state's laws bears the burden of rebutting that presumption." *Playboy Enters., Inc. v. Sanchez-Campuzano*, 519 F. App'x 219, 225 (5th Cir. 2013). Because neither side alleges that Texas law meaningfully differs from New York law, the undersigned will assume that Texas substantive law governs.

(5th Cir. 2010) ("However, under Texas law, a contract for a stated term longer than one year is not taken out of the statute of frauds when there is a mere possibility of termination within one year due to contingent events set forth in the contract, including termination by a party."). Accordingly, the undersigned rejects Ethereal's argument that the MSA is not governed by the statute of frauds by merit of the 30-day termination provision.

Ethereal also argues that the statute of frauds does not preclude the MSA because "Ethereal's performance is an exception to the statute of frauds under Texas" law. Dkt. 26, at 2. *See Bookout v. Bookout*, 165 S.W.3d 904, 907 (Tex. App.—Texarkana 2005, no pet.) ("Partial performance is an exception to the statute of frauds."). "The partial performance must be unequivocally referable to the agreement and corroborative of the fact that a contract was actually made." *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pet. denied).

ABC argues that this exception does not apply. Specifically, ABC contends that "the documents attached to the Motion contradict any allegation that Ms. Carson promised to execute the Unaccepted MSA." Dkt. 29, at 4-5. Ethereal disputes that claim, arguing that ABC is relying on documents which cannot be properly considered by the undersigned on a motion to dismiss. Dkt. 26, at 8-11. Accordingly, to determine who is correct, the undersigned will next examine which documents may be properly considered at this stage of the litigation.

"When considering a motion to dismiss under Rule 12(b)(6), the Court's review is limited to the complaint, any documents attached to the complaint, any documents

attached to the motion to dismiss that are central to the claim and referenced by the complaint, and matters subject to judicial notice under Federal Rule of Evidence 201." *Moore v. Louisiana*, No. 4:22-CV-02542, 2023 WL 4933957, at *2 (S.D. Tex. Aug. 2, 2023).

Three documents are relevant here: Exhibits 1-3 of Carson's declaration, Dkt. 14-1. Exhibit 1 is an email from Gary Adelman to Carson containing an unexecuted and redlined copy of the MSA. Dkt. 14-1, at 3-14. Exhibit 2 is an email that Carson sent containing a redlined and unexecuted term sheet. *Id.* at 15-22. Exhibit 3 is an email Gary Adelman sent to Carson containing a redlined and unexecuted term sheet. *Id.* at 23-32. ABC argues that "[t]hose contemporaneous communications between the Defendants and the Plaintiff show that Ms. Carson never accepted the terms of the Unaccepted MSA." Dkt. 29, at 5. Specifically, ABC contends that:

> Emails between the Defendants and the Plaintiff here specifically indicate that from August to December 2022, Ethereal sent various unilateral draft proposals to Ms. Carson, who in turn rejected the Defendants' drafts by sending a proposed term sheet to the Defendants. The Defendants subsequently rejected Ms. Carson's proposal. Defendants offer no meaningful rebuttal to the documents unequivocally demonstrating that the parties were actively negotiating the terms of a potential relationship and that the terms of the Unaccepted MSA had not been agreed upon or accepted.

*Id.* (cleaned up).

Ethereal has two responses. First, Ethereal concedes that Exhibit 1 "was referenced in the Counterclaims and is admittedly central to Count I." Dkt. 26, at 8. But Ethereal argues that, while the attached and unexecuted MSA was missing material terms, "Ethereal alleged that OMC was designated by the parties to be the contracting party and that the effective date was on or about August 12, 2022." *Id.* at

9. Accordingly, the undersigned finds that Exhibit 1 does not "contradict any allegation that Ms. Carson promised to execute the Unaccepted MSA." Dkt. 29, at 4-5. As such, Exhibit 1 does not warrant dismissing Count I. *See Hoffman v. L & M Arts*, No. 3:10-CV-0953-D, 2011 WL 3567419, at *10 n.11 (N.D. Tex. Aug. 15, 2011) ("[T]he document provided in this case is silent on the issue of fact being asserted and does not directly contradict the second amended complaint.").

Exhibits 2 and 3 are trickier. Because Ethereal did not attach Exhibits 2 and 3 to its complaint, they must be "central to the claim and referenced by the complaint" to be considered. *Moore*, 2023 WL 4933957, at *2. Exhibit 2 meets that standard. Exhibit 2 is a December 15, 2022, email sent from Carson with the subject line "ABC Term Sheet." Dkt. 14-1, at 16. In that email, Carson attaches a lightly edited, unexecuted version of the ABC Term Sheet. *Id.* at 18-22. Ethereal references that email in its amended answer, noting:

> All throughout this time, Carson repeatedly promised Ethereal that Ethereal would receive fifteen percent (15%) of ABC and the ABC Club, and to induce Ethereal to continue selling memberships, upon the total of $500,000 in memberships sold, Ethereal would receive an additional ten percent (10%) of ABC and the ABC Club. ***Indeed, in an email dated December 15, 2022, Carson sent Sabo an email attaching a revised draft of the Proposed Second Agreement.*** In her email, Carson reiterated that Ethereal would receive "15% [of ABC] on vesting upon signing and the second 10% vesting upon $500k in memberships sold."
>
> In her email, Carson stated that she was obtaining a "breakdown of expenses incurred to date", which made Sabo believe that Carson was indeed intent on executing the Proposed Second Agreement and provided further basis for Ethereal to perform as requested.

Dkt. 16, at ¶¶ 71-72 (emphasis added).

Because Exhibit 2 is referenced in Ethereal's amended answer, and because it is central to Ethereal's breach of contract claim, Exhibit 2 may be considered by the undersigned. But Exhibit 2 does not contradict Ethereal's argument that it accepted the terms of the MSA via its partial performance. Rather, Exhibit 2 merely demonstrates that Carson had proposed minor changes to the MSA in December 2022. That is entirely consistent with Carson's having earlier accepted the contract via Ethereal's partial performance. Accordingly, the undersigned concludes that Exhibit 2 does not render implausible Ethereal's claim that it accepted the MSA via partial performance, which constitutes an exemption to the statute of frauds.

Exhibit 3 is an email sent by Gary Adelman, Ethereal's Managing Director, on December 30, 2022. Dkt. 14-1, at 24. That email generally outlines concerns Adelman had with the contracting process, including uncertainty regarding the cost and duration of the lease for the Golf Course:

> I have also never been involved in building anything in which the Company that [is] responsible for the build does not also own the land, so this is new and I keep saying to myself, how does this work? What happens when the lease expires? Also new is this lease concept with the rent being a percentage of EBITDA. I have no experience with that and do not understand how that works. EBITDA is a way to evaluate a company and its value. I've never seen it as a benchmark for distributing funds to anyone/anything and there was no formula.

*Id.* at 25. The email also attached a heavily edited, unexecuted term sheet.

However, Exhibit 3 is not referenced in Ethereal's amended answer. ABC claims that "Mr. Adelman's December 30, 2022 response is indirectly referenced through descriptions of Ethereal's reaction to the Proposed Term Sheet[.]" Dkt. 23, at 10 (citing Dkt. 14, at ¶ 89). But the cited paragraph in Ethereal's amended answer

12

merely notes that "This Floating Rent Formula raised considerable concerns with Ethereal due to how unpredictable and unstable it made the ABC Club's rent expenses." That does not constitute a citation to Exhibit 3; even if it did, it is not "central to the claim" of breach of contract. *Moore*, 2023 WL 4933957, at *2. Accordingly, the undersigned will not consider Exhibit 3.

To recap, Exhibits 1 and 2 may be considered, but they do not undermine Ethereal's argument that it accepted the MSA via partial performance. Exhibit 3 cannot be considered because it was never referenced by Ethereal. Because Exhibit 3 may not be considered, ABC's argument against the partial performance exception fails. That is, Ethereal has plausibly pleaded that it accepted the MSA via partial performance, and no documents that can be considered by the undersigned displace that argument. The undersigned therefore recommends against dismissing Count I on that basis.

2.      Ethereal adequately pleaded a meeting of the minds.

ABC also argues that Ethereal failed to adequately plead a meeting of the minds between the two parties. *See Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 529 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (listing "a meeting of the minds" as a required element for a binding contract). Because the MSA was never executed, Ethereal alleges that the MSA was accepted by performance. But ABC contends that "that conclusory allegation is insufficient to withstand a motion to dismiss in light of contemporaneous communications demonstrating that the terms of the Unaccepted MSA … were unequivocally rejected." Dkt. 23, at 4-5 (emphasis

omitted). ABC bases that argument on "Ms. Carson's Declaration" and "The Parties' Real Time Communication." *Id.* at 5.

The problem for ABC is that neither Ms. Carson's declaration nor the parties' real time communications in Exhibit 3 can be considered. Neither document was included in Ethereal's complaint, so they must have been "central to the claim and referenced by the complaint" to be considered. *Moore*, 2023 WL 4933957, at *2. Based on the undersigned's review, *see supra* at 11-13, Ethereal's counterclaims never referenced Ms. Carson's declaration or Exhibit 3. Accordingly, there is no document that the undersigned can consider that renders Ethereal's meeting-of-the-minds allegations implausible. Therefore, the undersigned recommends against dismissing Count I on that basis.

### B.    Promissory Estoppel

Ethereal's second amended counterclaim is for promissory estoppel against Carson, OMC, and ABC ("Count II"). Dkt. 16, at 38. Ethereal's promissory estoppel claim arises from Carson's alleged promises to: (1) execute the MSA and (2) execute the Proposed Second Agreement. ABC alleges that both promises are unenforceable pursuant to the statute of frauds. Dkt. 23, at 8-9.

"Promissory estoppel applies to bar the application of the statute of frauds and allow the enforcement of an otherwise unenforceable oral agreement[.]" *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 438 (Tex. App.—Dallas 2002, pet. denied). Promissory estoppel bars the application of the statute of frauds where: "(1) the promisor makes a promise that he should have expected would lead the promise to

some definite and substantial injury; (2) such injury occurred; and (3) the court must enforce the promise to avoid the injury." *Id.* Relevant here, "[f]or promissory estoppel to create an exception to the statute of frauds, there must have been a promise *to sign a written agreement that had been prepared and that would satisfy the requirements of the statute of frauds.*" *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 29 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (emphasis added). ABC argues that there was no written agreement that, had it been signed, would satisfy the statute of frauds; accordingly, ABC contends that promissory estoppel does not apply. Dkt. 23, at 8-13. To determine the validity of that argument, the undersigned will consider the MSA and the Proposed Second Agreement separately.

1.   MSA

Ethereal alleges that "Carson, on behalf of OMC, promised Ethereal that she would execute the MSA in exchange for Ethereal to immediately begin performing under the SOW." Dkt. 16, at ¶ 165. ABC argues that Ethereal's allegation that Carson made a promise to execute the MSA "is entirely belied by documents referenced, but not attached, to the Counterclaims." Dkt. 23, at 10. Specifically, ABC contends that Carson's December 15, 2022, email (Exhibit 2) and Adelman's December 30, 2022, response (Exhibit 3) undercut the assertion that Carson made such a promise. *Id.* at 10-11. ABC argues that "[t]hose communications make clear that Ms. Carson rejected the Unaccepted MSA and that the Parties were not in agreement on any terms of the Proposed Term Sheet." *Id.* (emphasis omitted).

15

The undersigned rejects that argument. As explained *supra* at 10-12, the Exhibits 1 and 2 do not render implausible Ethereal's allegation that Carson promised to execute the MSA in exchange for partial performance by Ethereal. Rather, Exhibit 1 simply demonstrates that, as of August 1, 2022, the MSA was missing material terms. Dkt. 14-1, at 4-14. Exhibit 2 is similarly unhelpful to ABC, as it merely demonstrates that Carson had slight edits to the agreement as of December 15, 2022. Dkt. 14-1, at 16-17. That does not render implausible Ethereal's allegation that Carson promised she would execute the MSA in exchange for immediate partial performance by Ethereal. Finally, Exhibit 3 cannot be considered at this stage of the proceedings. *See supra* at 12-13.

### 2.    Proposed Second Agreement

In addition to the MSA, the parties negotiated a separate agreement referred to as the Proposed Second Agreement. Dkt. 16, at ¶ 61. The Proposed Second Agreement dictated that Ethereal, Carson, OMC, and an entity called Project GG, LLC ("GG"), would co-own the Golf Course and ABC. *Id.* Under that agreement, Carson, OMC, and GG would form ABC which would own the Golf Course, and Ethereal would co-own ABC and the Golf Course. *Id.* Specifically, Ethereal would get fifteen percent of ABC and the Golf Course and would receive an additional ten percent upon the total of $500,000 in memberships sold. *Id.* at ¶ 65. Ethereal alleges that Carson "promised Ethereal that she would execute an agreement embodying the terms of the Proposed Second Agreement and an operating agreement for ABC

provided that Ethereal immediately begin providing its Management/Promotional Services." *Id.* at ¶ 167.

ABC disagrees. It argues that Exhibits 2 and 3 render implausible Ethereal's argument that the Second Agreement was accepted by Carson. As ABC contends:

> [A]ny allegation that Ms. Carson promised to execute a document characterized as the Proposed Second Agreement is entirely belied by the Parties' communications in December 2022. Ms. Carson proposed a term sheet in connection with the Parties' negotiations, and Ethereal rejected the term sheet, making it abundantly clear that there was no agreement on any of its terms.

Dkt. 23, at 12. The undersigned rejects that argument. Exhibit 3 may not be considered, *see supra* at 12-13, and Exhibit 2—a December 2022 email from Carson containing minor edits to a term sheet—does not render implausible Ethereal's allegation that Carson orally accepted the terms of the Proposed Second Agreement.

ABC also contends that the Court should reject the promissory estoppel claim "because Defendants fail to allege a sufficiently definite promise." Dkt. 23, at 13 (capital omitted). "To support a finding of promissory estoppel, the asserted 'promise' must be sufficiently specific and definite that it would be reasonable and justified for the promisee to rely upon it as a commitment to future action." *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 635 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). ABC says that "[b]ecause the Proposed Second Agreement/Proposed Term Sheet contemplates further negotiations, it is not 'sufficiently definite' to form the basis of a promissory estoppel claim." Dkt. 23, at 13; *see Stolts v. Wells Fargo Bank, NA*, 31 F. Supp. 3d 876, 881 n.4 (S.D. Tex. 2014) ("Promissory estoppel claims

premised on promises to negotiate fail as a matter of law because they are not sufficiently definite[.]").

The undersigned rejects that argument. While promissory estoppel cannot apply to an agreement to negotiate, parties do not need to have precisely hashed out every detail for promissory estoppel to apply. Take, for instance, *LeCroy v. Canon U.S.A., Inc.*, No. 1:21-CV-035-H, 2021 WL 2338862 (N.D. Tex. June 8, 2021). There, an employee pitched a business plan to his superiors. *Id.* at *1. Rather than agree on a payment system for that business plan, the worker's supervisor "acknowledged [his] proposed commission and explained to him in an email that his commission would be addressed outside of his ordinary salary structure." *Id.* That, the court held, was sufficiently definite for promissory estoppel to apply. Here, the Proposed Second Agreement contains far more definite terms, foreclosing ABC's argument.

Based on the foregoing, the undersigned concludes that Count II should not be dismissed.

## C.    Quantum Meruit

Ethereal also pleads a quantum meruit claim against ABC ("Count III"). Dkt. 16, at ¶ 185. To recover under quantum meruit,

> a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) those services and materials were accepted by the person sought to be charged, and were used and enjoyed by him; and (4) the person sought to be charged was reasonably notified that the plaintiff performing such services or furnishing such materials was expecting to be paid by the person sought to be charged.

18

*Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732-33 (Tex. 2018). Ethereal argues that it provided valuable services to OMC and Carson under the SOW, warranting recovery under quantum meruit. Dkt. 16, at ¶ 187.

ABC contends that Ethereal failed to adequately allege the reasonable value of work performed or the materials furnished to ABC, which ABC says is a necessary element for pleading quantum meruit. For support, ABC cites *LTS Group, Inc. v. Woodcrest Capital, L.L.C.*, 222 S.W.3d 918, 920-21 (Tex. App.—Dallas 2007, no pet.), which noted that "[a] party must introduce evidence on the correct measure of damages to recover on quantum meruit, which is the reasonable value of work performed and the materials furnished."

But that argument relies on a *post-verdict* standard that does not apply here at the motion-to-dismiss stage. This Court dealt with a similar argument in *United States of Am. for the Use & Benefit of E J Smith Constr., Co., LLC v. Travelers Cas. & Sur. Co.*, No. 5:15-CV-971 RP, 2016 WL 1030154 (W.D. Tex. Mar. 10, 2016). There, a party argued that a quantum meruit claim failed because the plaintiff did not plead sufficient facts to show the reasonable value of labor or services performed and materials to be furnished. *Id.* at *12. The Court rejected that argument, noting that "there is no requirement that a plaintiff provide a detailed calculation of damages in its complaint." *Id.* While the party would be required to make such a showing at trial, "it need not do so at this early stage of the litigation." *Id.*

This case is no different. If Ethereal's counterclaims proceed to trial, then it *will* be required to allege the reasonable value of work performed or the materials

furnished to ABC. But at the pleading stage, Ethereal has met its burden to plausibly allege a claim of quantum meruit. Accordingly, the undersigned recommends against dismissing Count III.

### D.     Unjust Enrichment

Ethereal also alleges that it is "entitled to recover based on the quasi-contract theory of unjust enrichment" ("Count IV"). Dkt. 16, at ¶ 199. "Unjust enrichment is an equitable theory of recovery that is based on an implied agreement to pay for benefits received." *Jupiter Enterprises, Inc v. Harrison*, No. 05-00-01914-CV, 2002 WL 318305, at *3 (Tex. App.—Dallas Mar. 1, 2002, no pet.). To recover for a claim of unjust enrichment,

> a claimant must prove: (1) that valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used, and enjoyed by that person; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.

Id.

ABC argues that Ethereal failed to plausibly make a claim for damages under a theory of quantum meruit. Dkt. 23, at 14-15. Specifically, ABC argues that because "all of Defendants' counterclaims fail," "Defendants' unjust enrichment theory— which is merely a theory of recovery, not an independent cause of action—likewise fails and should be dismissed." *Id.* Because the undersigned has rejected ABC's previous arguments for dismissal, this argument is unavailing. Accordingly, the undersigned recommends against dismissing Count IV.

### E.    Money Had and Received

Ethereal also alleges that OMC failed to pay Ethereal money owed under the MSA ("Count V"). Dkt. 16, at ¶ 215. "To prove a claim for money had and received, a plaintiff must show that (1) a defendant holds money (2) which in equity and good conscience belongs to the plaintiff." *Graman v. Graman*, No. 05-14-01254-CV, 2016 WL 235055, at *5 (Tex. App.—Dallas Jan. 20, 2016, no pet.).

ABC argues that this claim should be dismissed because Ethereal "fail[s] to allege that any of the Carson Parties are in possession of funds belonging to Ethereal. At most, they allege that the Carson Parties have failed to compensate them pursuant to purported agreements and/or promises." Dkt. 23, at 15. But that simply isn't true. Ethereal alleged that ABC obtained $77,000 in funds paid by Ethereal from its Stripe Account. Dkt. 16, at ¶ 236 ("Carson asked for and received seventy-seven thousand dollars ($77,000) from the membership proceeds that she used to essentially pay herself[.]"). That is enough to adequately plead a claim of unjust enrichment. *See Brown v. Whitcraft*, No. CIV.A.3:08CV0186-D, 2008 WL 2066929, at *5 (N.D. Tex. May 15, 2008) (finding money had and received was appropriately pleaded where plaintiff alleged that defendant received money to which he was not entitled). Accordingly, the undersigned recommends against dismissing Count V.

### F.    Fraud/Fraudulent Inducement

Ethereal also pleads a claim for fraud/fraudulent inducement ("Count VI"). Dkt. 16, at ¶ 220. Specifically, Ethereal contends that ABC "materially misrepresented that they would be utilizing NFT Memberships for the ABC Club."

*Id.* And Ethereal alleges that "Carson and OMC also materially misrepresented their intentions to be bound by the MSA and to pay Defendants according to its terms." *Id.* at ¶ 223. Ethereal further says that "the Original Carson Parties materially misrepresented that Ethereal would be made a member of the entity owning the Golf Club, i.e. ABC." *Id.* at ¶ 224.

To state a claim for fraudulent inducement, a plaintiff must establish the elements of fraud:

> (1) a material misrepresentation; (2) that is false; (3) when the defendant made the representation, the defendant knew it was false or made the statement without any knowledge of its truth; (4) the defendant intended the plaintiff to rely on the representation, and the plaintiff actually relied on the representation; and (5) the defendant's actions caused an injury.

*Sharp Mexican Partners, LP v. Republic Waste Servs. of Tex., Ltd.*, No. 3:17-CV-1605-S, 2018 WL 4053365, at *4 (N.D. Tex. Aug. 24, 2018) (quoting *Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011)). "Because fraudulent inducement arises only in the context of a contract, the existence of a contract is an essential part of its proof." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).

ABC argues that there are two reasons to dismiss Count VI. First, ABC contends that Ethereal's "fraudulent inducement claim fails because the unaccepted MSA and Proposed Second Agreement are not enforceable contracts." Dkt. 23, at 16 (capitals omitted). Specifically, ABC argues that "[t]he Parties' contemporaneous communications referenced in the Counterclaims demonstrate that they were in the

process of negotiating these contemplated agreements and negotiations broke down without the agreements being finalized." *Id.* at 16-17.

The undersigned has already rejected this argument. As explained *supra* at 7-14, Ethereal has plausibly alleged that it accepted the MSA through partial performance. And in any event, Ethereal could still be entitled to out-of-pocket damages even if the MSA were not enforceable. *See Hugh Symons Group, plc v. Motorola, Inc.*, 292 F.3d 466, 470 (5th Cir. 2002) ("To the extent, however, that a plaintiff's fraud claim seeks out-of-pocket damages incurred by relying upon a defendant's misrepresentations, those damages are not part of the benefit of any bargain between the parties. They therefore might be recoverable without contravening the statute of frauds."). Accordingly, the undersigned finds that Count VI should not be dismissed on that basis.

ABC's second argument for dismissal is that "Defendants' fraud/fraudulent inducement claim fails because Defendants fail to meet the heightened pleading standard under Federal Rule of Civil Procedure 9(b)." Dkt. 23, at 17 (capitals omitted). Federal Rule of Civil Procedure 9(b) dictates that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Fifth Circuit has interpreted Rule 9(b) to require: (1) specification of the statements considered to be fraudulent; (2) identity of the speaker; (3) the time and location the statements were made; and (4) an explanation of why the statements were fraudulent. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009). Importantly, however, "Rule 9(b)

supplements but does not supplant Rule 8(a)'s notice pleading," requiring "only simple, concise, and direct allegations of the circumstances constituting fraud." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009) (cleaned up).

ABC contends that Ethereal failed to meet this heightened pleading standard. Specifically, ABC takes issue with three claims: the "Alleged Funding Representations," the "Alleged Permitting Representations," and the "Alleged Timeline Representations," collectively the "Alleged Misrepresentations." The undersigned will consider each in turn.

### 1.    Alleged Funding Representations

First, ABC argues that Ethereal inadequately pleaded that Carson represented that she had the funds necessary to complete the permit process and to build most of the golf course. Specifically, Ethereal's complaint says:

> In early-mid 2022, Carson also represented to Sabo that the funds necessary to complete the permit process and to build most of the golf course were already in place. According to Carson, the funding needed to complete the ABC Club was primarily funds to build ancillaries such as pickle ball courts, the spa area, etc.
>
> At all times mentioned above, Carson, OMC, and GG materially misrepresented facts regarding funds on hand that they had to complet[e] permitting and all or part of the Golf Course[.]

Dkt. 16, at ¶¶ 23, 221.

The undersigned finds that this is sufficient for Ethereal to meet its pleading requirements. Ethereal alleged the specific statements considered to be fraudulent (that Carson had enough money), the identity of the speaker (Carson), the time and location the statements were made (early-mid 2022, via email or other correspondence), and an explanation of why the statements were fraudulent (so

24

Ethereal would start performing immediately). *Flaherty*, 565 F.3d at 207. Requiring any more would place form over function and ignore Rule 8's stricture that a complaint only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The undersigned therefore recommends against dismissing Count VI on that basis.

### 2. Alleged Permitting Representations

Next, ABC argues that Ethereal inadequately pleaded that Carson misrepresented her knowledge and the anticipated ease of the permitting process. Specifically, Ethereal pleaded that:

> In early 2022, Carson also represented to Sabo that permitting would not be an issue, that she understood what permits were necessary and that there would be no issues building the Golf Course on OMC's Property. Moreover, in an email dated May 15, 2022, Carson told Sabo that it would take approximately nine months for permitting to be completed once permit requests were submitted. Carson also stated that she had engaged an architect and engineering firm for the project and indicated that permit applications would be filed soon. Based on Carson's assurances, Sabo reasonably believed that ABC Club could be completed according to the ABC timeline.

> At all times mentioned above, Carson, OMC, and GG materially misrepresented facts regarding … that Carson was aware of what permits were necessary[.]

Dkt. 16, at ¶¶ 24, 221. As above, the undersigned finds that these allegations satisfy Rule 9(b)'s heightened pleading standard.

ABC also argues that the Alleged Permitting Representations "amount to statements of opinion, which are insufficient to support a fraud/fraudulent inducement claim as a matter of law." Dkt. 23, at 19. And it is certainly true that pure expressions of opinion are not the basis for fraud liability. *See Italian Cowboy*

*Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337-38 (Tex. 2011) ("Pure expressions of opinion are not representations of material fact, and thus cannot provide a basis for a fraud claim.").

But Carson's statements went beyond pure expressions of opinion. According to Ethereal's allegations, Carson averred that she knew the permitting process's intricacies and that, based on her superior knowledge, she predicted that the process would take nine months. "Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made." *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995). Here, Carson ostensibly had far superior knowledge of the permitting process, inducing Ethereal to rely on her. "Special or one-sided knowledge may help lead to the conclusion that a statement is one of fact, not opinion." *Italian Cowboy*, 341 S.W.3d at 338. Accordingly, the undersigned finds that Carson's statements were representations of material fact and therefore actionable at the pleading stage.

### 3. Alleged Timeline Representations

Finally, ABC argues that Ethereal inadequately pleaded that Carson misrepresented the anticipated timeline of building the Golf Course. Specifically, Ethereal pleaded

> In emails, telephone calls and during in-person meetings in early 2022, Carson represented a timeline for her development of the Golf Course to Sabo and indicated … that she anticipated permits being granted by May of 2023, clearing for fairways would begin in mid-September of 2022, at least some of clearing and holes would be completed by November of 2022 and the grand opening occurring by September-December of 2023 (the "ABC Timeline"). Part of the ABC Timeline is included in at least one email from Carson to Sabo dated May 15, 2022.

> [T]he ABC Timeline given by Carson never could have been followed as Carson and her entities did not have any of the permits in place or the funding for the permits as represented by Carson.

> At a minimum, the Carson Parties were aware that the ABC Timeline could not be complied with as no attempt to obtain any permits was made.

Dkt. 16, at ¶¶ 21, 77, 82. For the reasons stated *supra* at 24-25, the undersigned finds that Ethereal's pleading satisfies Rule 9(b). Further, for the reasons stated *supra* at 25-26, the undersigned finds that Carson's Alleged Timeline Representations were representations of material fact and therefore actionable in fraud.

In conclusion, Ethereal has adequately pleaded a claim of fraud under Rule 9(b). The undersigned therefore recommends that Count VI not be dismissed.

### G.   Declaratory Judgment

Ethereal also pleads a claim for a declaratory judgment ("Count VII"). Dkt. 16, at ¶ 252. Specifically, Ethereal contends that it is "entitled to a judgment declaring that the Carson Parties are responsible for defending, indemnifying and holding Defendants harmless, including attorneys' fees and costs, from claims due to the Carson Parties' termination of the NFT Membership program and failing to reimburse or otherwise compensate those members." *Id.* "When considering an action for a declaratory judgment, a court must ask (1) whether an actual controversy exists between the parties in the case; (2) whether it has authority to grant declaratory relief; and (3) whether to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Disability Rights Tex. v. Bishop*, 615 F. Supp. 3d 454, 460 (N.D. Tex. 2022) (internal quotation marks omitted).

ABC argues that this claim puts the cart before the horse. First, it says that Ethereal fails "to allege that the Carson Parties have informed any purchaser of an NFT Membership that their purchase will not be honored in the form of a 'traditional membership.'" Dkt. 23, at 20. Second, ABC says that Ethereal has "failed to allege that they actually sent NFTs to the members who purchased an NFT membership." *Id.* But both of those arguments are beside the point. What matters is that Ethereal has plausibly alleged that ABC's actions have opened it up to liability, as demonstrated by Ethereal's pleading that one customer has already initiated a chargeback. Dkt. 16, at 20.

ABC's next argument is trickier. ABC contends that "[a]bsent a contractual or statutory basis, Texas does not recognize a right to indemnity." Dkt. 23, at 20; *see F & F Ranch v. Occidental Chem. Corp.*, No. 14-09-00901-CV, 2011 WL 1123402, at *4 (Tex. App.—Houston [14th Dist.] Mar. 29, 2011, no pet.) ("However, the Ranch has not cited, nor have we found, any cases in which a party has been 'equitably indemnified.'"). But *common law* indemnification *is* available to Ethereal. *See In re Saenz*, 516 B.R. 423, 432 (Bankr. S.D. Tex. 2014) ("[C]ommon law indemnity is recoverable by a defendant who, through no act of his own, has been made to pay for the negligence of another defendant based solely upon the relationship between the two defendants.") (quotation omitted). Accordingly, the undersigned recommends against dismissing Count VII.

## IV.     RECOMMENDATION

In accordance with the foregoing discussion, the undersigned **RECOMMENDS** that the District Court **DENY** ABC's Motion to Dismiss Ethereal's Amended Counterclaims, Dkt. 23. **IT IS FURTHER ORDERED** that this case be removed from the Magistrate Judge's docket and returned to the docket of the Honorable Robert Pitman.

## V.     WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED January 25, 2024.


DUSTIN M. HOWELL

UNITED STATES MAGISTRATE JUDGE